**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ADRIENNE YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-650 |
| | ) | |
| | ) | Judge Cathy Bissoon |
| CITY OF PITTSBURGH, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM ORDER</u>

For the reasons stated below, Moving Defendants' joint motion for summary judgment

(Doc. 70) will be granted.[1]

According to the allegations in the second amended complaint (Doc. 52), Adrienne

Young ("Plaintiff"), was arrested on four separate occasions over a ten-month period.  The final

three arrests occurred in the middle of the night and, Plaintiff alleges, were unwarranted and

demeaning.  On the fourth occasion, Plaintiff was held at the Allegheny County, Pennsylvania,

jail for nearly a month, and classified as a high risk prisoner because of her arrest history.

Plaintiff complains that she was a victim of persecution resulting from the personal enmity of a

group of Pittsburgh police officers.  Using the enforcement vehicle of the Civil Rights Act of

1871, 42 U.S.C. § 1983, she is suing a multitude of individuals and the City of Pittsburgh for

violating her rights under the First, Fourth, Fifth and Fourteenth Amendments to the Constitution

of the United States.  <u>See</u> (Doc. 52 ¶¶ 128-194; 199-202; 206-210).  Plaintiff also raises state law

claims against Moving Defendants for intentional infliction of emotional distress.  <u>Id.</u> ¶¶ 195-

---

[1] Defendants Thomas McCaffrey, Marilyn Lahood, Colleen Sypolt, Linda Francis, Debbie Puc,
Dan Trbovich and Paul Larkin take no part in the joint motion for summary judgment.

198.  Plaintiff's claims against Defendant Harper in his official capacity were dismissed on

July 26, 2012.  (Doc. 68).

Moving Defendants filed the instant motion for summary judgment on August 2, 2012.

(Doc. 70).  Plaintiff filed a response in opposition thereto on October 9, 2012.  (Doc. 81).

Moving Defendants filed a reply on October 23, 2012.  (Doc. 87).  This motion is ripe for

disposition.

I.     Factual Background and Legal Claims

The material facts of this case that are relevant to this opinion are as follows:


A.    The First Arrest

In the early hours of May 13, 2008, Plaintiff's car collided with another car, which was

driven by her occasional paramour, Thomas Doswell ("Doswell").[2]  Defendant Brust, a City of

Pittsburgh police officer, was driving her patrol car a short distance behind Plaintiff and Doswell

at the time of the collision, and was an eyewitness to the same.

In her report of the incident, Defendant Brust describes seeing Doswell's car, followed by

Plaintiff's, travelling at a high rate of speed[3] on Friendship Avenue, a two-lane residential street

---

[2] Plaintiff describes her relationship with Doswell as "tumultuous" – a gross understatement, based on the record – and admits that fighting between her and Doswell "leaked over into the filing of police reports and PFAs."  (Doc. 87 ¶ 2).  The record contains evidence that various Defendants, including Kascuta, Brust and Nee, were aware of Plaintiff and Doswell's violent history prior to the events relevant to this case.  See, e.g., (Docs. 82-10 at 35; 71-8 at 11; 82-11 at 29); but see (Doc. 71-4 at 9).  Additionally, it is noteworthy that Defendant Kascuta testified that this was not the first car crash of which she knew involving Plaintiff and Doswell. (Doc. 82-10 at 35).

[3] Plaintiff contests that she was speeding.  Be that as it may, it is undisputed by the parties that the ensuing collision was at a low speed, and resulted in minimal damage to both automobiles.

in Pittsburgh. Both cars slowed, and Defendant Brust observed Plaintiff's car travel into the opposing lane of traffic and align itself parallel to Doswell's car. Plaintiff then drove next to Doswell for a short distance, and slowed again as if to return to her initial position behind him. However, Plaintiff's car instead struck Doswell's, damaging her front passenger-side quarter panel, and Doswell's rear driver-side quarter panel. Promptly after this took place, Defendant Brust initiated a traffic stop. (Docs. 71-2 at 5; 81 ¶¶ 2-3). It is undisputed that the damage to both automobiles was minor, and that both were drivable after the collision. (Docs. 71-2 at 5; 82-2 at 2-7; 87 ¶ 8).

Plaintiff alleges that she came upon Doswell by coincidence on her way home from a late night at work.[4] (Doc. 82-1 ¶ 4). The record is unclear as to why Plaintiff chose to enter the opposing lane of traffic when she encountered Doswell that night – at times she claims that she was startled by his presence in her neighborhood, and was just trying to pass him; at others, she states that she noticed the presence of two female passengers in the car, and she drove alongside to get a better look them. (Docs. 71-10 at 2-3; Doc. 71-11 at 86). Whatever her reasons, she is adamant that the collision itself simply was an unintended automobile accident. (Doc. 82-1 ¶ 5).

The record indicates that, soon after Brust stopped the two cars, Plaintiff exited her automobile and accused Doswell of having "drugs and underage girls" in his car. Id. ¶ 6. It also appears that, when asked for his version of events, Doswell informed Brust that he had been the victim of past instances of stalking and harassment by Plaintiff, and accused her of trying to kill him. (Docs. 71-2 at 5; 71-10 at 3-4). Plaintiff claims that, when she tried to explain her side of

---

[4] Moving Defendants dispute this, noting that there is evidence on the record that Plaintiff had left a note on the windshield of Doswell's car earlier that night. Testimony to this effect was given by witnesses at Plaintiff's preliminary hearing, although this information was not explicitly included in Defendant Brust's affidavit of probable cause. (Docs. 71-2 at 5; 71-3 at 6).

the story, Defendant Brust told her to "shut up" and that she was going to jail "for trying 'to hurt

them' referring to [Doswell's two] white female[] [passengers]." (Doc. 82-1 ¶ 6). Plaintiff

accuses Defendant Brust of then subjecting her to a search by "a white, male officer[,]" telling

her to shut up when she protested, and then "add[ing] that [Plaintiff] would be getting three

counts of aggravated assault." Id.

Defendants, to the contrary, assert that Plaintiff's collision with Doswell's car was

intentional, albeit poorly executed. Defendant Henderson, a City of Pittsburgh police sergeant

who arrived on the scene shortly after the stop but prior to Plaintiff's arrest, opined that

Defendant Brust's recitation of events was consistent with a PIT maneuver, and advised

Defendant Brust that aggravated assault charges were appropriate. (Docs. 71-8 at 4; 81 ¶¶ 4-7).

Plaintiff then was arrested and charged with Aggravated Assault, 18 Pa. Con. Stat. § 2702(a)(1),

Reckless Endangerment of Another Person ("REAP"), 18 Pa Con. Stat. § 2705, Violation of No

Passing Zone, 75 Pa. Cons. Stat. § 3307, and Reckless Driving, 75 Pa. Cons. Stat. § 3736.

A preliminary hearing on the above charges was held in domestic court on July 22, 2008.

(Doc. 81 ¶ 17). At the hearing, testimony was given by Doswell's passengers, and Plaintiff

presented photographs of the damage to the automobiles. The magistrate cut the hearing short,

making the following finding:

> Let me qualify myself. I raced stock cars professionally for eight
> years. I'm quite aware of what automobiles can do and will do
> under high impact. And this was not a high impact strike. This
> was not a high impact strike. This is nothing more than a light
> fender bender. . . .
>
> I want you two to get together and figure out where you're going
> with this. I'll give you five minutes. You two work out what
> charges we're going to hold here because I'm ready to make a
> decision right now.

(Doc. 71-3 at 30). After a brief recess, during which the parties came to no resolution, that court continued:

> I'll tell you what I'm doing. It's a garbage case. It shouldn't be here. I'm dismissing everything without prejudice, subject to re-filing. Get the charges good.

Id. at 31.


B. OMI Complaint

On May 16, 2008, shortly after being released on bond from her first arrest, and well-prior to her preliminary hearing, Plaintiff filed a complaint with Pittsburgh's Office of Municipal Investigations ("OMI") against Defendant Brust. (Doc. 81 ¶ 11). Defendants Brust and Henderson both were interviewed by the OMI on September 16, 2008. (Doc. 87 ¶ 38). Plaintiff places a great deal of emphasis on the fact that the timing of some of Defendants Henderson and Brust's communications regarding refiling charges against her coincided with the general timeframe of the OMI investigation. (Doc. 82-4 at 13).

During their interviews, Defendants Brust and Henderson discussed their intent to refile charges against Plaintiff at a later date, and referenced communications in which they had engaged, and steps that they had taken, to further that end. (Doc. 71-8 at 4). It is noteworthy that, at one point during her interview, Defendant Brust indicated refiling charges against Plaintiff was necessary – at least in part – to preserve her credibility. Id. at 23-24. Defendant Henderson asserted during his interview that the magistrate was "out of line" for dismissing the charges against Plaintiff. (Doc. 82-4 at 22). The parties disagree on whether the district attorney's office supported refiling the charges, (Doc. 81 ¶ 23); however, at a deposition taken in

connection with the instant suit, Defendant Henderson indicated that he would have directed

Defendant Brust to refile the charges regardless of the wishes or advice of the district attorney's

office. (Doc. 82-10 at 12).[5]

While the OMI complaint was pending, Plaintiff hired a private detective named Barry

Fox ("Fox"). Fox advised Plaintiff that she should withdraw the complaint in order to ensure

that her ordeal with the police would come to an end.[6] (Doc. 82-1 ¶ 11). Plaintiff took Fox's

advice and attempted to withdraw the complaint on July 2, 2008; however, pursuant to OMI

policy, and as stated above, the investigation into Plaintiff's allegations continued. On

March 2, 2009, the OMI released a report exonerating Defendant Brust. (Doc. 87 ¶ 85; Doc. 28-

5 at 11-28). On March 24, 2010, Plaintiff filed another complaint with the OMI. (Doc. 82-6 at

29-47). While the OMI refused to reopen the portions of the complaint that were addressed in its

initial investigation, other allegations appear to have survived that determination. Id. at 46-47.

The ultimate disposition of this complaint, if any, is not on the record.

---

[5] Defendant Henderson also testified that Police received no explicit training on how to react to being the subject of an OMI complaint. He opined that "[o]ther than going in and telling the truth I don't know what training you would need." (Doc. 82-10 at 3).

[6] While it is clear from the record that Fox spoke tp Defendant Brust about the May 13, 2008 arrest, there is no indication that Defendant Brust requested that Plaintiff withdraw her complaint. Instead, a fair reading of the record – drawing every inference in favor of Plaintiff – leads to the conclusion that this suggestion was entirely Fox's idea. See, e.g., (Doc. 82-1 ¶ 11).

C.  The Second Arrest

On October 7, 2008, Defendant Brust refiled charges against Plaintiff in connection with the May 13, 2008, incident.[7]  (Doc. 81 ¶ 24).  In the criminal complaint, Plaintiff was charged with a lesser degree of Aggravated Assault, 18 Pa. Con. Stat. § 2702(a)(4) and (b), REAP, 18 Pa. Cons. Stat. § 2705, Violation of a No Passing Zone, 75 Pa. Cons. Stat. 3307(b), and Reckless driving, 75 Pa. Cons. Stat. § 3736(a).  (Doc. 82-4 at 24-29).  Defendant Brust's affidavit of probable cause included essentially the same allegations that were in the initial affidavit – however, she, for the first time, characterized Plaintiff's collision with Doswell's car as a PIT maneuver.  (Doc. 82-4 at 29).  Defendant Kascuta, a City of Pittsburgh police lieutenant who admitted in deposition testimony that she erroneously thought that she also was a subject of Plaintiff's OMI, approved the refiling.[8]  The complaint then was reviewed by the district

---

[7] Plaintiff asserts that the method in which Defendant Brust refiled the complaint violated standing police policy.  (Doc. 87 ¶¶ 47-54).  It is not disputed that Brust sought review and approval of the warrant application from the district attorney's office prior to filing it.  (Doc. 83 at 27).

[8] The history between Plaintiff and Defendant Kascuta goes back to the 1990s, when Defendant Kascuta interviewed Plaintiff as a potential narcotics confidential informant.  Plaintiff avers that, during that meeting, Defendant Kascuta attempted to initiate a romantic encounter, which Plaintiff declined.  Defendant Kascuta then allegedly left the meeting "enraged[,]" and has since allegedly taken to making "denigrating comments about [Plaintiff] to anyone who knew [Plaintiff]."  (Doc. 82-1 ¶ 21).

Defendant Kascuta denies that she ever made a pass at Plaintiff, and adamantly asserts that any reference to her sexual orientation is irrelevant to this suit.  (Doc. 87 ¶ 57).  She claims that she felt that Plaintiff was not credible from the point that they first met in the 1990s, and is quite open with her opinion that Plaintiff is mentally unstable.  (Doc. 82-10 at 36).  Indeed, Defendant Kascuta admits to sharing this opinion with other people on prior occasions. Id. at 35.  She cites to an incident in 2006 or 2007, in which Plaintiff was in another car accident with Doswell, as a basis for this opinion.  Id. at 34-36.  Defendant Kascuta asserts that Plaintiff makes her "very uncomfortable" and is someone with whom she would prefer not to interact.  Id. at 36.

attorney's office, and a state court magistrate approved the issuance of a warrant for Plaintiff's arrest, based on the assertions contained therein.[9]  (Doc. 81 ¶ 25).

During the early hours of October 8, 2008, Plaintiff was arrested at her home.  It appears from the record that Defendant Brust did not take part in the arrest, as she was uneasy being present while the OMI complaint was pending.  (Doc. 87 ¶ 56).  However, Defendant Kascuta was present at the arrest as part of the team serving the warrant.  Plaintiff requested to be allowed to change her clothing prior to being transported to jail, and Defendant Kascuta accompanied Plaintiff to her bedroom while she did so.  While in the bedroom, Plaintiff complains of Defendant Kascuta watching her undress, and claims that, when Plaintiff made reference to her Bible, Defendant Kascuta called her a "religious nut."  Kascuta responds that Plaintiff was an arrestee and it would have been inappropriate and unsafe to allow her to move about her home unsupervised; she also denies calling Plaintiff a religious nut.  Id. ¶ 59.

Plaintiff was released on her own recognizance later that day.  She appeared before a magistrate on November 18, 2008.  Once again, the Aggravated Assault charges were dismissed; however, the REAP charges and traffic violations were held over for trial.  (Doc. 87 ¶ 62).  On February 25, 2010, a trial was held, and Plaintiff was found guilty of a summary offense of passing where prohibited.  All other charges were dismissed by the presiding judge.  (Doc. 81 ¶ 61).

---

[9] Defendants assert that the issuance of an arrest warrant was proper in this case, because Plaintiff was charged with a felony.  (Doc. 87 ¶ 53); Pa. R. Crim. P. 509(2)(a).

D.  PFA and the Third Arrest

After the first arrest in May of 2008, Doswell obtained a protection from abuse order ("PFA") against Plaintiff.  The record indicates that Defendant Brust most likely advised Doswell to do this; however, even if she did not, this was not the first PFA that Doswell had attempted to acquire against Plaintiff, and it is clear that he was familiar with both their existence and the procedure for obtaining them.  (Doc. 87 ¶ 27).  A temporary PFA was issued on Doswell's *ex parte* petition on June 30, 2008.  (Doc. 71-5 at 3).  After a hearing on the merits, at which both parties were represented by counsel, a permanent PFA was issued against Plaintiff on July 10, 2008.  Id.  One of the provisions of the permanent PFA was that Plaintiff was not to contact Doswell "either directly or indirectly, by telephone or by any other means, including through third persons."  (Doc. 86-10 at 3).  The PFA order was set to expire on July 10, 2009. Id. at 5.

On December 30, 2008, Plaintiff called the Zone 5 police station to complain that she had received a number of harassing phone calls from Doswell.  (Doc. 82-5 at 1-2).  Later, Plaintiff contacted Defendant Nee, a City of Pittsburgh police detective, and multiple telephone calls were exchanged between the two individuals.  During the course of one of these calls Plaintiff informed Defendant Nee about the PFA.  (Doc. 87 ¶¶ 63-65).  Plaintiff asserts that she also informed Defendant Nee about her OMI complaint against Defendant Brust, and that Nee lost interest in the investigation at that point – but this claim is denied.  Id. ¶ 87.

During the course of his investigation, Defendant Nee obtained Plaintiff's cellular telephone records, which indicated that Plaintiff herself had made several calls to a cell phone that was registered to Doswell.  (Doc. 87 ¶ 67).  Defendant Nee discussed this matter with Defendant Kascuta, who ordered him to file indirect criminal contempt ("ICC") charges against

Plaintiff for violating the terms of the PFA. Id. ¶¶ 67-68. In spite of this order, Defendant Nee was unsure that probable cause existed for a warrant – particularly because Doswell had not filed any sort of complaint. He sought guidance from assistant district attorney David Spurgeon ("Spurgeon"), who opined that probable cause existed, but recommended further investigation. Id. ¶¶ 69-70. Defendant Nee contacted Doswell himself, who, according to the ICC warrant, confirmed that he possessed the cellular phone that Plaintiff had called. (Doc. 82-5 at 3). However, Doswell refused to speak further with Defendant Nee, and referred him to his attorney. (Doc. 87 ¶ 71).

Still unsatisfied, Defendant Nee spoke with assistant district attorney Rebecca Auld ("Auld").[10] Id. ¶ 72. Auld spoke with her supervisor, and ultimately recommended against arrest; however, it is noteworthy that she did confirm that Plaintiff's actions constituted a technical violation of the terms of the PFA. Id. ¶ 74; (82-11 at 33-34).

While Defendant Nee was investigating the matter – and after his initial conversation with Defendant Kascuta – he was receiving significant pressure from Defendant Kascuta – his superior – to file ICC charges against Plaintiff. Defendant Kascuta went so far as to order Defendant Nee to write a so-called "Special," in which he was to detail why he "went over her head" twice with respect to that case. (Doc. 82-5 at 6-7). Defendant Nee did so on January 27, 2009, and filed the ICC warrant application on the following day, which was approved by a magistrate. Id. at 3-4.

The record indicates that Plaintiff was arrested, again, at her home on January 29, 2009. See (Doc. 82-6 at 36-37); but see (Doc. 82-1 ¶¶ 28-29). Defendant Kascuta was part of the team

---

[10] Auld was the assistant district attorney assigned to prosecute the then-pending charges stemming from the May 13, 2008, encounter between Doswell and Plaintiff. (Doc. 87 ¶ 73).

that served the warrant.  (Doc. 87 ¶ 29).  Plaintiff was released on bond the same day.  (Doc. 82-6 at 37; Doc. 86-11 at 1); but see (Doc. 82-1 ¶ 29).   A hearing on these charges was continued until the expiration of the PFA order on July 10, 2009.  (Doc. 81 ¶ 52).

E.  Fourth Arrest and Lengthy Detention

On March 4, 2009, the Zone 5 police station received multiple calls from Renee Taylor ("Taylor"), one of Doswell's passengers during the May 13, 2008 encounter with Plaintiff.[11] (Doc. 87 ¶ 87; Doc. 82-5 at 45; Doc. 82-11 at 27).  There is evidence on the record that some calls from the police station were placed to Taylor as well.  Later that day, Taylor arrived at the station, and was interviewed by Defendant Flynn, a city of Pittsburgh police detective.[12]  (Doc. 81 ¶ 39; Doc. 87 ¶¶ 85-87).  She complained that she had received harassing telephone calls from Plaintiff, in which Plaintiff threatened to burn down Taylor's house if Taylor did not assist in the

---

[11] As with several of the other individuals involved in this case, Plaintiff has a history with Taylor that predates the incident of May 13, 2008.  Taylor testified that, about two weeks prior to the incident, Plaintiff had come to the door of an apartment that Taylor was visiting, "asking for information about [Doswell], about what he was doing, did I know anything, like was I seeking him.  She even told me that he was a whore."  (Doc. 71-11 at 55).  Plaintiff recalls meeting Taylor a few days earlier than that encounter, testifying that Taylor came to Doswell's apartment drunk, asking for Doswell, and screaming "room service."  Id. at 74, 82-83.  Additionally, when asked why she was so interested in the occupants of Doswell's car on May 13, 2008, Plaintiff testified "[b]ecause he had told me that he was not having a relationship with Renee Taylor and I believed that he was . . . ."  Id. at 88.  It also is noteworthy that Taylor was a witness at the preliminary hearing on Plaintiff's initial arrest, and at Doswell's PFA hearing.

[12] The parties dispute whether Defendant Kascuta sat in on the interview; however, it is undisputed that she was at the Zone 5 police station in her official capacity at the time and date of Taylor's interview.  (Doc. 87 ¶ 88; Doc. 82-7 at 6).

prosecution of Plaintiff's OMI complaint against Brust.[13]  Although it appears from the record that Taylor lived in Wilkinsburg – a suburb of Pittsburgh – at the time, it also appears that she reported to Defendant Flynn that she received at least some of the calls while driving in Pittsburgh.  Based on Taylor's complaints, Defendant Flynn applied for a warrant for Plaintiff's arrest.[14]

In the affidavit of probable cause, Defendant Flynn makes several inconsistent assertions, on which Plaintiff places great import.  First, he states that he received the information regarding the alleged crimes on March 1, 2009 – three days before Taylor came to the police station to make her complaint.  Second, he indicated that his knowledge of the facts set forth in the affidavit was based on personal observations as well as Taylor's statements.  The record demonstrates that Defendant Flynn had only Taylor's statements to go on.[15]  Third, Defendant Flynn transposed Plaintiff and Taylor's name in about two paragraphs of the affidavit.  (Doc. 82-6 at 1-5).

Plaintiff was charged with misdemeanor violations of Intimidation of a Witness, 18 Pa. Con. Stat. § 4952(a)(1), and Terroristic Threats, 18 Pa. Con. Stat. § 2706(a)(1).  (Doc. 82-6 at 2). An arrest warrant was approved by a magistrate and, on March 5, 2009, Plaintiff was yet again

---

[13] The affidavit of probable cause indicates that Taylor also accused Plaintiff of making calls in which she threatened her life.  (Doc. 82-6 at 5).  At his deposition, Defendant Flynn admitted that Taylor never told him that.  (Doc. 82-9 at 32).

[14] Taylor has a significant criminal history, which include several *crimen falsi*.  She also was charged with making a false police report on October 4, 2008, and pleaded guilty to the same on March 13, 2009 – less than two weeks after making her complaint against Plaintiff.  (Doc. 82-6 at 11-12).

[15] However, it is worth mentioning that the section of the affidavit in which actual allegations of fact are made never references Defendant Flynn's personal knowledge, and instead cites to statements made to him.  (Doc. 82-6 at 5).

arrested at her home, and Defendant Kascuta was once again part of the team executing the warrant. (Doc. 87 ¶ 42).

This time, instead of a quick release, Plaintiff was ordered to submit to electronic monitoring, and was forced to wait for 28 days in Allegheny County Jail for a monitor to become available. Plaintiff appears to blame this, at least in part, on Brust's attendance of the hearing, which both parties characterize as unusual. Id. ¶ 115. Defendant Brust testified that she attended because she was subpoenaed by the district attorney's office. (Doc. 71-29 at 27-28).

In September of 2009 – after Plaintiff's electronic monitoring condition was removed, Defendant Nee notified Auld and Commander Ross of the Pittsburgh police that Taylor's phone records appeared to support the conclusion that Plaintiff had not called her. (Doc. 87 ¶ 117). Defendant Nee also stated during his deposition that Taylor admitted to Auld that she had lied about the phone call. Id. ¶ 118. Auld testified that she did not recall having been told this. (Doc. 82-8 at 6). The district attorney eventually chose not to prosecute these charges – although Defendants claim that is because they were denied a continuance to obtain Plaintiff's telephone records. (Doc. 87 ¶ 97).

F. Interactions with Defendant Harper

During the course of the foregoing events, Plaintiff had made several complaints about her treatment to various city officials, including Defendant Harper – who was, at that time, the chief of police.[16] (Doc. 82-9 at 42). Plaintiff avers that, at the end of October, 2008 – after her

_____

[16] In his deposition, Defendant Henderson expressed a significant amount of contempt for this course of action, implying that it somehow interfered with the proper course of the criminal justice system. (Doc. 82-10 at 16-17). He also claimed that Defendant Brust was under significant political pressure at that time not to refile the charges. Id. at 16.

second arrest – she met with Defendant Harper, presented her version of the facts underlying these arrests to him, and expressed her belief that charges from the May, 2008 encounter with Doswell were refiled because of the OMI complaint. (Doc. 82-1 ¶ 23). Plaintiff left that meeting with the impression that Defendant Harper intended to intercede in the prosecution on her behalf. Id. As may be seen by the record, no such intercession took place. To the contrary, Plaintiff alleges that Defendant Harper ceased taking her calls sometime after her third arrest in January of 2009. (Doc. 87 ¶ 80). Plaintiff additionally avers that, in August of 2009, she overheard both sides of a telephone conversation regarding her plight between Defendant Harper and another individual, during which Defendant Harper said of Plaintiff "she deserves this, she tried to get some of my officers in trouble." (Doc. 82-1 ¶ 41).

II.    Analysis

Defendants raise several arguments in support of their motion for summary judgment. These will be addressed below.

A.    Probable Cause

Defendants argue that probable cause existed for each of Plaintiff's four arrests, thus undermining any claims for false arrest or malicious prosecution. (Doc. 73 at 12). As the lack of probable cause is an element of Plaintiff's false arrest claims, see Pittman v. McDuffy, 240 F. App'x. 524, 526 (3d Cir. 2007) (citing Dowling v. City of Phila., 855 F.2d 136, 141 (3d Cir. 1988)); cf. Papachristou v. City of Jacksonville, 405 U.S. 156, 169 (1972), and her malicious prosecution claims, see Kossler v. Crisanti, 564 F.3d 181, 186 (3d Cir. 2009) (quoting Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003)), and also is closely related to her retaliation

14

claims, see Hartman v. Moore, 547 U.S. 250, 265-66 (2006), it is worthwhile to begin this Court's analysis here.

The Fourth Amendment states, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." In the context of a warrantless arrest, it is well-established that the standard is "whether, at the moment the arrest was made . . . the facts and circumstances within [the arresting officer's] knowledge and of which [he or she] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, 379 U.S. 85, 91 (1964). While "[p]robable cause to arrest requires more than mere suspicion . . . it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir. 1995). Probable cause requires only a "fair probability" that the arrestee committed the relevant crime. See Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000).

In order to determine whether probable cause exists, a court must apply a "common sense approach" based on the totality of the circumstances. Pfaff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 2000) (internal citations omitted). As such, this Court must "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." Maryland v. Pringle, 540 U.S. 366, 371, (2003) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). Later acquittal of the crimes for which an individual was arrested is irrelevant to the determination of whether probable cause existed to effectuate the arrest lawfully. Wright v. City of Phila., 409 F.3d 595, 602 (3d Cir. 2005). However, false statements that are made knowingly or recklessly by police

can invalidate probable cause, even in the event that a warrant is issued, if that warrant is based on those statements. Wilson, 212 F.3d at 786-87.

The evidence on the record, when viewed in the light most favorable to the Plaintiff, leads inescapably to the conclusion that all of her arrests were supported by probable cause. See Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997). With respect to the first arrest on May 13, 2008, it is clear that Brust's own personal observation of the circumstances leading to the collision, the nature of the collision itself, and Doswell's accusations, provided probable cause to believe that Plaintiff had attempted to cause serious bodily injury to Doswell and his passengers "intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" See Pa Cons. Stat. § 2702(a)(1).

So too was probable cause apparent in the second arrest. Plaintiff places a great deal of emphasis on Defendant Brust's use of the word "rammed" in her affidavit of probable cause, but overlooks the fact that she mentioned that the vehicles slowed twice before the collision, and that both vehicles were drivable after the incident. (Doc. 82-4 at). Additionally, the type of damage to the vehicles that Brust described was only minor in nature. Id.

Plaintiff also attacks Defendant Brust's description of the collision as a PIT maneuver. However, given Defendant Brust's admission in the affidavit that the event occurred at a low speed, as well as the fact that she described only minor damage to the automobiles, it is clear that this was intended to describe the appearance and orientation of the cars during the collision, and not the magnitude of forces involved. Indeed, Plaintiff's own expert opines that "[t]he only similarity between this cra[s]h and a 'PIT' maneuver was the orientation of the vehicles and the lateral directions of force between the vehicles." (Doc. 82-3 at 36). Additionally, the nature of

the damage, while undisputedly minimal, does not undermine the existence of probable cause given the totality of the circumstances witnessed by Defendant Brust.

Finally, it is noteworthy that, while the magistrate at Plaintiff's preliminary hearing on her first arrest opined that this was a "garbage case," and that it involved a mere "fender bender" as opposed to a high speed collision, he did not dismiss the charges with prejudice. Instead, he gave the district attorney the explicit opportunity to refile with the proper charges. This is exactly what Defendant Brust attempted to do by charging Plaintiff, after discussing the matter with the district attorney's office, with a lesser degree of Aggravated Assault.[17]

With respect to the third arrest – for Indirect Criminal Contempt – it is apparent that Defendant Nee had probable cause to believe that Plaintiff's multiple calls placed to a telephone registered to Doswell violated the terms of the PFA. Even if, as Plaintiff suggests in her brief, see (Doc. 83 at 37-39), this Court were to insert information into the complaint regarding Defendant Nee's reluctance to pursue the ICC warrant, the district attorney's advice, and Doswell's refusal to confirm or deny contact with Plaintiff, it is clear that probable cause existed for the charges.

Similarly, probable cause existed when Defendant Flynn sought a warrant for terroristic threats and witness intimidation leading to Plaintiff's fourth arrest – even if Defendant Flynn's erroneous assertion that the affidavit was based on personal knowledge, his scrivener's error transposing Plaintiff and Taylor's names in a few paragraphs, and his admittedly false statement that Taylor claimed that Plaintiff had threatened her life were removed.

---

[17] Plaintiff also finds fault in the timing and manner in which Defendant Brust refiled the charges, and claims that it deviated from established police policy on the refiling of charges dismissed at preliminary hearings. There is no indication on the record, however, that deviation from this policy – to the extent that it is applicable – has any bearing at all on the determination of whether probable cause existed for Plaintiff's second arrest.

An informant who relates his or her information to a law enforcement officer during an in-person meeting is more reliable than an anonymous caller. United States v. Valentine, 232 F.3d 350, 354 (3d Cir. 2000). The corroboration of an informant's tip by independent police work enhances the value of an informer's tip. Illinois v. Gates, 462 U.S. 213, 241-42 (1983). However, courts have recognized that "[p]olice are entitled to base an arrest on a citizen complaint, whether of a victim . . . or a nonvictim witness, without investigating the truthfulness of the complaint, unless . . . they have reason to believe it's fishy." See Guzell v. Hiller, 223 F.3d 518, 519-20 (7th Cir. 2000) (citing cases); see also United States v. Hammond, 666 F.2d 435, 439 (9th Cir. 1982).

Plaintiff had a known history involving her self-described "tumultuous" relationship with Doswell, and Taylor's association with him had caused friction with Plaintiff in the past. Taylor also appeared in-person at the police station, and was a witness in the then-pending criminal matter stemming from the second arrest. Even in the light most favorable to Plaintiff, it is clear that probable cause existed for her fourth arrest. While there is significant support on the record for the conclusion that Taylor's allegations turned out to be untruthful, that is irrelevant to the probable cause determination. Furthermore, it seems apparent that alleged threats to burn down Taylor's house would justify an arrest warrant pursuant to Pennsylvania Rule of Criminal Procedure 509(c).

Because probable cause existed for all four arrests, Plaintiff's claims of malicious prosecution and false arrest must fail.

Additionally, to the extent that Plaintiff claims that Defendant Brust somehow is liable to her for providing testimony at Plaintiff's bail hearing after her fourth arrest, she is mistaken. Trial witnesses enjoy absolute immunity from suit, including a Section 1983 suit, with respect to

any claim based on their testimony.  Briscoe v. LaHue, 460 U.S. 325, 332–333 (1983).  This applies to testimony at trial, id., at pre-trial proceedings, including depositions, Williams v. Hepting, 844 F.2d 138, 142-43 (3d Cir. 1988), and before a grand jury, Rehberg v. Paulk, —— U.S. ——, ——, 132 S.Ct. 1497, 1510 (2012).  Therefore, at whatever stage in Plaintiff's fourth criminal proceedings Defendant Brust testified, she is immune from liability allegedly flowing from such testimony.

B.  Invasion of Privacy under Fourth Amendment

Moving Defendants also attack Plaintiff's "invasion of privacy" claim.  (Doc. 73 at 21-22).  Plaintiff makes no response to this in her brief.[18]  Because Plaintiff was the subject of a lawful custodial arrest, Defendant Kascuta's observation of her while she voluntarily changed clothes is not a violation of the Fourth Amendment.  Cf. United States v. Robinson, 414 U.S. 218, 235 (1973) ("in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment").  Plaintiff's apparent position that she should have been allowed access to her bedroom without officer supervision, while she was being arrested for Aggravated Assault, is, to put it bluntly, absurd.[19]  Accordingly, summary judgment on this claim will be granted to Defendants.

---

[18] Moving Defendants characterize this claim as arising out of state law.  (Doc. 73 at 21-22).  For the reasons stated in the order of this Court denying Defendants' earlier motion to dismiss, it is clear that Plaintiff pleads it as a constitutional tort, and it will be treated as such.  See (Doc. 68 at 3-4).

[19] Even if a constitutional claim could be made for a violation of Plaintiff's "right to privacy" under the specific circumstances of this case, qualified immunity would be appropriate.  See (continued. . .)

C.  First Amendment Retaliation

"In general, constitutional retaliation claims are analyzed under a three-part test.  Plaintiff must prove (1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation."  Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282 (3d Cir. 2004).  Additionally, in a case such as this where a prosecution commenced, a plaintiff must show the absence of probable cause.  Hartman, 547 U.S. at 265-66; (Doc. 83 at 12-13).  Here, because probable cause existed for Plaintiff's four arrests and prosecutions, she cannot prevail on her retaliation claims, and summary judgment will be granted in favor of Moving Defendants on them.


D.  Supervisory Liability

Defendants next argue that Plaintiff has not demonstrated the requisite personal involvement of Defendant Harper in his personal capacity, and assert that he is entitled to summary judgment for that reason.  (Doc. 73 at 6).   In light of the fact that Plaintiff cannot prove an underlying constitutional violation on the part of Defendant Harper's subordinates, (nor on the part of Defendants Kascuta and Henderson's subordinates, to the extent that supervisory liability is being asserted against them), Moving Defendants will be granted summary judgment on these claims as well.

---

DeLauri v. New Jersey Div. of State Police, No. 05-4165, 2009 WL 222983, at *6-*8 (D.N.J. Jan. 27, 2009).

E.  Municipal Liability

Defendants next argue that Plaintiff has not met her burden to demonstrate municipal

liability under Section 1983 against Defendant City of Pittsburgh.  (Doc. 73 at 3, 10).   Because

the record indicates that Plaintiff did not suffer a constitutional violation at the hands of an

employee of Defendant City of Pittsburgh, or as a result of one of its policies, or lack thereof,

summary judgment will be granted in Moving Defendants' favor.


F.  Conspiracy

Defendants next attack Plaintiff's claim that Defendants engaged in a conspiracy to

deprive Plaintiff of her rights under various Amendments to the Constitution of the United

States.  (Doc. 73 at 35).  Plaintiff does not respond to this argument in her brief.  See, generally

(Doc. 83).

Section 1983 does not create a cause of action for conspiracy in and of itself.  Instead, in

order to prevail, a plaintiff also must show some underlying deprivation of a constitutional right.

Davis v. Wilson, No. 08-589, 2009 WL 688912, at *12 (W.D. Pa. Mar 12, 2009) (Hay, Mag. J.)

(quoting Holt Cargo Systems, Inc. v. Delaware River Port Auth., 20 F. Supp. 2d 803, 843 (E.D.

Pa. 1998)); see also Hickson v. Marina Assocs., 743 F. Supp. 2d 362, 377 n.22 (D.N.J. 2010)

("[t]he theory of conspiracy does not yield an independent cause of action under Section 1983,

but instead presents merely a means to impute liability to other wrongdoers for violations of

federal rights" (citing Revak v. Leiberum, No. 08-691, 2009 WL 1099187, at *2 (W.D. Pa.

Apr. 23, 2009)).

Given (1) Plaintiff's failure to respond to Moving Defendants' argument; (2) this Court's

finding that Plaintiff has shown no constitutional deprivation at the hands of moving Defendants;

and (3) the lack of indication on the record that Moving Defendants had engaged in any illicit agreement with any nonmoving Defendant, summary judgment will be granted against Plaintiff on this claim as well.

     G.  <u>Fourteenth Amendment Equal Protection Claim</u>

Plaintiff's Equal Protection claim – in which she alleges that she singled out for arrest and prosecution due to her race and/or religious beliefs, (Doc. 52 ¶¶ 191-92) – fails, as a matter of law, because there was probable cause for her arrests.  See <u>Pittman v. Metuchen Police Dept.</u>, 441 F. App'x 826, 829 (3d Cir. 2011).

     H.  <u>Intentional Infliction of Emotional Distress</u>

In order to succeed on a claim for intentional infliction of emotional distress under Pennsylvania law, Plaintiff must show that Defendant, by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress.  See <u>McCluskey v. United States</u>, No. 10-694, 2010 WL 4024717, at *4 (W.D. Pa. Oct. 12, 2010) (quoting Restatement (Second) of Torts § 46); <u>see also</u> <u>Taylor v. Albert Einstein Med. Ctr.</u>, 754 A.2d 650, 652 (Pa. 2000). Pennsylvania law defines outrageous conduct as that which is "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  <u>Reeves v. Middletown Athletic Ass'n</u>, 866 A.2d 1115, 1123 n.5 (Pa. Super. 2004) (quoting <u>Hoy v. Angelone</u>, 720 A.2d 745, 754 (Pa. 1998)).  It is clear that neither an arrest supported by probable cause, nor securing an arrestee for officer safety while she changes clothes, rise to this level.

III.    <u>Conclusion</u>

For the reasons stated above, Moving Defendants' joint motion for summary judgment

(Doc. 70) is **GRANTED**.


**IT IS SO ORDERED.**



Date: March 26, 2013                                    BY THE COURT:


                                                        <u>s/Cathy Bissoon</u>
                                                        CATHY BISSOON
                                                        UNITED STATES DISTRICT JUDGE


cc (via CM/ECF):
all counsel of record.